# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

JASON ROBERT POWELL,

      Petitioner,

v.                                                        Case No. 3:22-cv-264-TJC-SJH

SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,
et al.,

      Respondents.

_____

## ORDER

## I.   Status

Petitioner, an inmate of the Florida penal system, initiated this case through counsel by filing a Petition for Writ of Habeas Corpus Under 28 U.S.C. § 2254 (Doc. 1). He challenges a state court (Nassau County, Florida) judgment of conviction for attempted murder and aggravated battery. He is serving a twenty-two-year prison sentence. Respondents filed a Response (Doc. 7) with exhibits (Docs. 7-1 to 7-15; "Resp. Ex.").[1] Petitioner filed a Reply (Doc. 12) and a Supplement (Doc. 13). This case is ripe for review.[2]

---

[1] The Court cites to the document and page numbers as assigned by the Court's electronic case filing system.

[2] "In a habeas corpus proceeding, the burden is on the petitioner to establish the need for an evidentiary hearing." Jones v. Sec'y, Fla. Dep't of Corr., 834 F.3d 1299, 1318

## II.    Governing Legal Principles

### A. Standard Under AEDPA

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs a state prisoner's federal habeas corpus petition. See Ledford v. Warden, Ga. Diagnostic & Classification Prison, 818 F.3d 600, 642 (11th Cir. 2016). "'The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction.'" Id. (quoting Greene v. Fisher, 565 U.S. 34, 38 (2011)).

The first task of the federal habeas court is to identify the last state court decision, if any, that adjudicated the petitioner's claims on the merits. See Marshall v. Sec'y Fla. Dep't of Corr., 828 F.3d 1277, 1285 (11th Cir. 2016). The state court need not issue an opinion explaining its rationale for the state court's decision to qualify as an adjudication on the merits. See Harrington v. Richter,

---

(11th Cir. 2016) (citing Chavez v. Sec'y Fla. Dep't of Corr., 647 F.3d 1057, 1060 (11th Cir. 2011)). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." Schriro v. Landrigan, 550 U.S. 465, 474 (2007) (citation omitted). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." Id. The Court finds that "further factual development" is not necessary. Turner v. Crosby, 339 F.3d 1247, 1275 (11th Cir. 2003). Thus, an evidentiary hearing will not be conducted on any ground.

562 U.S. 86, 100 (2011). When the state court's adjudication on the merits is unaccompanied by an explanation,

> the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning. But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018).

When a state court has adjudicated a petitioner's claims on the merits, a federal court cannot grant habeas relief unless the state court's adjudication of the claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(1), (2). A state court's factual findings are "presumed to be correct" unless rebutted "by clear and convincing evidence." Id. § 2254(e)(1).

> AEDPA "imposes a highly deferential standard for evaluating state court rulings" and "demands that state-court decisions be given the benefit of the doubt." Renico v. Lett, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011)

(internal quotation marks omitted). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. [at 102] (citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003)). The Supreme Court has repeatedly instructed lower federal courts that an unreasonable application of law requires more than mere error or even clear error. See, e.g., Mitchell v. Esparza, 540 U.S. 12, 18 (2003); Lockyer, 538 U.S. at 75 ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); Williams v. Taylor, 529 U.S. 362, 410 (2000) ("[A]n unreasonable application of federal law is different from an incorrect application of federal law.").

Bishop v. Warden, GDCP, 726 F.3d 1243, 1253-54 (11th Cir. 2013) (internal citations modified).

## B. Exhaustion and Procedural Default

There are prerequisites to federal habeas review. Before bringing a § 2254 habeas action in federal court, a petitioner must exhaust all state court remedies that are available for challenging his state conviction. See 28 U.S.C. § 2254(b)(1)(A). To exhaust state remedies, the petitioner must "fairly present[]" every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review. Castille v. Peoples, 489 U.S. 346, 351 (1989) (emphasis omitted). Thus, to properly exhaust a claim, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999); see also Pope

4

v. Rich, 358 F.3d 852, 854 (11th Cir. 2004) (noting "that Boerckel applies to the state collateral review process as well as the direct appeal process.").

In addressing exhaustion, the United States Supreme Court explained:

> Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." Duncan v. Henry, 513 U.S. 364, 365 (1995) (per curiam) (quoting Picard v. Connor, 404 U.S. 270, 275 (1971)). To provide the State with the necessary "opportunity," the prisoner must "fairly present" his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim. Duncan, 513 U.S. at 365-66; O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999).

Baldwin v. Reese, 541 U.S. 27, 29 (2004) (internal citations modified).

A state prisoner's failure to properly exhaust available state remedies results in a procedural default which raises a potential bar to federal habeas review. The United States Supreme Court has explained the doctrine of procedural default as follows:

> Federal habeas courts reviewing the constitutionality of a state prisoner's conviction and sentence are guided by rules designed to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism. These rules include the doctrine of procedural default, under which a federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule. See, e.g., Coleman, 501 U.S. at 747-48; Wainwright v. Sykes, 433 U.S. 72, 84-85 (1977). A state court's invocation of a procedural rule to deny a prisoner's claims precludes

5

> federal review of the claims if, among other requisites, the state procedural rule is a nonfederal ground adequate to support the judgment and the rule is firmly established and consistently followed. <u>See, e.g.</u>, <u>Walker v. Martin</u>, 131 S. Ct. 1120, 1127-28 (2011); <u>Beard v. Kindler</u>, 130 S. Ct. 612, 617-18 (2009). The doctrine barring procedurally defaulted claims from being heard is not without exceptions. A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law. <u>See</u> <u>Coleman</u>, 501 U.S. at 750.

<u>Martinez v. Ryan</u>, 566 U.S. 1, 9-10 (2012) (internal citations modified). Thus, procedural defaults may be excused under certain circumstances. Notwithstanding that a claim has been procedurally defaulted, a federal court may still consider the claim if a state habeas petitioner can show either (1) cause for and actual prejudice from the default; or (2) a fundamental miscarriage of justice. <u>Ward v. Hall</u>, 592 F.3d 1144, 1157 (11th Cir. 2010). For a petitioner to establish cause and prejudice,

> the procedural default "must result from some objective factor external to the defense that prevented [him] from raising the claim and which cannot be fairly attributable to his own conduct." <u>McCoy v. Newsome</u>, 953 F.2d 1252, 1258 (11th Cir. 1992) (quoting <u>Murray v. Carrier</u>, 477 U.S. 478, 488 (1986). Under the prejudice prong, [a petitioner] must show that "the errors at trial actually and substantially disadvantaged his defense so that he was denied fundamental fairness." <u>Id.</u> at 1261 (quoting <u>Carrier</u>, 477 U.S. at 494).

<u>Wright v. Hopper</u>, 169 F.3d 695, 706 (11th Cir. 1999) (internal citations modified).

In the absence of a showing of cause and prejudice, a petitioner may receive consideration on the merits of a procedurally defaulted claim if the petitioner can establish that a fundamental miscarriage of justice, the continued incarceration of one who is actually innocent, otherwise would result. The Eleventh Circuit has explained:

> [I]f a petitioner cannot show cause and prejudice, there remains yet another avenue for him to receive consideration on the merits of his procedurally defaulted claim. "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." Carrier, 477 U.S. at 496. "This exception is exceedingly narrow in scope," however, and requires proof of actual innocence, not just legal innocence. Johnson v. Alabama, 256 F.3d 1156, 1171 (11th Cir. 2001).

Ward, 592 F.3d at 1157 (internal citations modified). "To meet this standard, a petitioner must 'show that it is more likely than not that no reasonable juror would have convicted him' of the underlying offense." Johnson v. Alabama, 256 F.3d 1156, 1171 (11th Cir. 2001) (quoting Schlup v. Delo, 513 U.S. 298, 327 (1995)). Additionally, "'[t]o be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial." Calderon v. Thompson, 523 U.S. 538, 559 (1998) (quoting Schlup, 513 U.S. at 324). With the rarity of such evidence, in most cases, allegations of actual innocence are ultimately summarily rejected. Schlup, 513 U.S. at 324.

## C. Ineffective Assistance of Counsel

"The Sixth Amendment guarantees criminal defendants the effective assistance of counsel. That right is denied when a defense attorney's performance falls below an objective standard of reasonableness and thereby prejudices the defense." Yarborough v. Gentry, 540 U.S. 1, 5 (2003) (per curiam) (citing Wiggins v. Smith, 539 U.S. 510, 521 (2003), and Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish ineffective assistance, a person must show that: (1) counsel's performance was outside the wide range of reasonable, professional assistance; and (2) counsel's deficient performance prejudiced the challenger in that there is a reasonable probability that the outcome of the proceeding would have been different absent counsel's deficient performance. Strickland, 466 U.S. at 687.

There is no "iron-clad rule requiring a court to tackle one prong of the Strickland test before the other." Ward v. Hall, 592 F.3d 1144, 1163 (11th Cir. 2010). Since both prongs of the two-part Strickland test must be satisfied to show a Sixth Amendment violation, "a court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa." Id. (citing Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000)). As stated in Strickland: "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." 466 U.S. at 697.

Further, "[t]he question is not whether a federal court believes the state court's determination under the <u>Strickland</u> standard was incorrect but whether that determination was unreasonable - a substantially higher threshold." <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 123 (2009) (quotation marks omitted). If there is "any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard," then a federal court may not disturb a state-court decision denying the claim. <u>Richter</u>, 562 U.S. at 105. As such, "[s]urmounting <u>Strickland</u>'s high bar is never an easy task." <u>Padilla v. Kentucky</u>, 559 U.S. 356, 371 (2010). "Reviewing courts apply a 'strong presumption' that counsel's representation was 'within the wide range of reasonable professional assistance.'" <u>Daniel v. Comm'r, Ala. Dep't of Corr.</u>, 822 F.3d 1248, 1262 (11th Cir. 2016) (quoting <u>Strickland</u>, 466 U.S. at 689). "When this presumption is combined with § 2254(d), the result is double deference to the state court ruling on counsel's performance." <u>Id.</u> (citing <u>Richter</u>, 562 U.S. at 105); <u>see also</u> <u>Evans v. Sec'y, Dep't of Corr.</u>, 703 F.3d 1316, 1333-35 (11th Cir. 2013) (en banc) (Jordan, J., concurring); <u>Rutherford v. Crosby</u>, 385 F.3d 1300, 1309 (11th Cir. 2004).

## III.   **Trial Testimony**

On direct appeal, the parties summarized the trial testimony in their briefs. The following summary is taken from Petitioner's initial brief on direct appeal.

The state presented the following witnesses:

**Hailey Powell**. Hailey Powell, Appellant Powell's daughter, stated that she was eighteen years old at the time of her testimony. Hailey Powell testified that in April of 2015, she, her sister, her mother (Amy Jo Powell), and Shawn Sherwood were staying at the Days Inn. Hailey Powell stated that on the night of April 26, 2015, she and her sister stayed in the hotel room and her mother and Mr. Sherwood went out,[] and she said that at one point during the evening, she heard her mother yell outside the window that "he was on his way" – and she indicated that she believed her mother was referring to her father. Hailey Powell testified that she proceeded to go to the balcony of her room and she saw her father's vehicle (i.e., a "white SUV") in the parking lot of the Days Inn. Hailey Powell stated that she then saw her father "floor[] it" and "clip[] Sherwood" and she said that he subsequently "put it in reverse and backed into Sherwood," causing Mr. Sherwood to fall down. Hailey Powell testified that she next saw her father get out of his vehicle and "get[] on top of" Mr. Sherwood. Hailey Powell stated that she ran towards her father in order to attempt to pull him off of Mr. Sherwood, and she said that she observed that Mr. Sherwood was bleeding. Hailey Powell testified that after her father was pulled off of Mr. Sherwood, he got into his vehicle and drove away.

On cross-examination, Hailey Powell stated that on the evening of April 26, 2015, Mr. Sherwood was mad because he thought her mother was cheating on him. Hailey Powell testified that prior to Mr. Sherwood's confrontation with Appellant Powell, Mr. Sherwood smelled of alcohol and his speech was slurred.

**Stephen Coleman**. Mr. Coleman stated that he went to the Seabreeze Lounge on the evening of April 26, 2015, and he said that he stayed at the bar until approximately 3 a.m. on April 27, 2015 (and he explained that he stayed at the bar after it closed so he could help one of the waitresses – Amy Jo Powell – close the bar). Mr. Coleman testified that after the bar closed, he and Amy Jo Powell exited the bar

and he observed Allison Gossett and Shawn Sherwood approaching them, and he said that he then observed a white SUV pull into the parking lot of the bar. Mr. Coleman stated that the vehicle drove past them, but he said that the vehicle then drove in reverse and he said that subsequently he observed Mr. Sherwood on the ground of the parking lot. Mr. Coleman testified that the driver of the vehicle subsequently got out of the vehicle and ran towards Mr. Sherwood and "jumped on top of him." Mr. Coleman stated that he proceeded to run towards the driver and he said that he pulled him off of Mr. Sherwood (and he testified that the driver drove away from the scene). Mr. Coleman said that he called 911, and during Mr. Coleman's testimony, the State played the recording of Mr. Coleman's 911 call. On cross-examination, Mr. Coleman testified that when he first observed Mr. Sherwood, Mr. Sherwood was acting in an aggressive manner and Mr. Coleman believed that Mr. Sherwood wanted to fight. Mr. Coleman stated that he then observed Mr. Sherwood move towards the SUV and he heard Mr. Sherwood say "I'm going to beat his ass."

**Allison Gossett**. Ms. Gossett testified that on the evening of April 26, 2015, she was at the Seabreeze Lounge (which she explained is connected to the Days Inn). Ms. Gossett stated that Amy Jo Powell was working at the Seabreeze Lounge on the evening of April 26, 2015. Ms. Gossett testified that at the end of the night, she went to the Days Inn with Shawn Sherwood, and she said that Mr. Sherwood was "emotionally hurt" based on a conversation he was having with Amy Jo Powell that night. Ms. Gossett testified that as she and Mr. Sherwood were walking to the Days Inn, Amy Jo Powell came running towards them saying "Jason's here." Ms. Gossett stated that Mr. Sherwood proceeded to run towards a white SUV, and she observed him "slam[] his hands down on the hood of the car." Ms. Gossett testified that the vehicle drove past Mr. Sherwood and she said she was clipped by the vehicle as it drove by her (i.e., she was hit by the side view mirror of the vehicle). Ms. Gossett stated that after the vehicle drove by Mr. Sherwood, Mr. Sherwood was standing directly behind the vehicle and she said that "the vehicle went into reverse and hit Mr.

Sherwood." Ms. Gossett testified that Mr. Sherwood ended up on the ground after he was hit by the vehicle, and she said that the driver of the vehicle (Appellant Powell) then exited the vehicle, approached Mr. Sherwood, and engaged in an altercation with him. Ms. Gossett stated that Appellant Powell subsequently got back in the vehicle and drove away. Ms. Gossett testified that when she approached Mr. Sherwood, she observed a pocketknife in his throat, and she said that she grabbed the pocketknife and threw it into the grass (although she said that it is possible that she did not even pull a knife out of Mr. Sherwood's throat). Ms. Gossett stated that the police subsequently arrived at the scene.

**Amy Jo Powell**. Amy Jo Powell, Appellant Powell's former wife, stated that she began dating Shawn Sherwood after she and Appellant Powell were divorced. Amy Jo Powell testified that she was working at the Seabreeze Bar during the early morning hours of April 27, 2015, and she said that she received a voice mail from Appellant Powell at 3:10 a.m. that morning. During Amy Jo Powell's testimony, the State played the recording of the voice mail for the jury:

> THE DEFENDANT: Hey, Amy. It's Jason. I wanted to leave a message for (inaudible) big mouth, small boy Shawn. You want to – hold on. Let me (inaudible). Since you're on my payroll, you're my bitch, little faggot. I was right there. All that shit you've been talking, guess what? You're still a punk pussy-ass bitch. You don't want – call me a faggot, you going to be getting your ass whipped by a faggot. Wouldn't that be fucking hilarious, you asshole son of a bitch (inaudible) your head (inaudible) faggot.

Amy Jo Powell stated that when her shift ended at work during the early morning hours of April 27, 2015, she left work and began walking toward the Days Inn (where she, her children, and Mr. Sherwood were staying). Amy Jo Powell testified that she first observed Allison Gossett and Mr. Sherwood sitting by a picnic table by the hotel, and she said that when Mr. Sherwood began to walk towards her, she then observed Appellant Powell's vehicle drive through the

parking lot and "clip" Mr. Sherwood (and Amy Jo Powell explained that Appellant Powell's vehicle was driving very slowly and although Mr. Sherwood was knocked down after being clipped, she did not believe he was injured from this first contact with the vehicle). Amy Jo Powell stated that Appellant Powell's vehicle then went in reverse and hit Mr. Sherwood again with the back of the vehicle.

On cross-examination, Amy Jo Powell conceded that in the days prior to the incident on April 27, 2015, she had met Appellant Powell for dinner, and she admitted that when Mr. Sherwood found out about the dinner (on the evening of April 26, 2015), he was mad and he was continuously calling her and expressing his anger during the evening of April 26, 2015. Amy Jo Powell stated that she was aware that Mr. Sherwood drank several beers on the evening of April 26, 2015. Amy Jo Powell testified that during the evening of April 26, 2015, and early morning hours of April 27, 2015, Mr. Sherwood was threatening to end his relationship with Amy Jo Powell (because he found out that Amy Jo Powell had dinner with Appellant Powell) and therefore Amy Jo Powell asked Ms. Gossett to go to the hotel to calm Mr. Sherwood down. Amy Jo Powell stated that when Appellant Powell arrived at the scene during the early morning hours of April 27, 2015, Mr. Sherwood was "cussing" at Appellant Powell and was "ready to fight." Amy Jo Powell added that Mr. Sherwood said the following to Appellant Powell:

I'm going to kick your ass. You don't want none of this. Step out the car pussy.

Amy Jo Powell testified that after Mr. Sherwood fell down the first time after being clipped by Appellant Powell's vehicle, she observed Mr. Sherwood get up, and approach Appellant Powell's vehicle and scream/yell at Appellant Powell. Amy Jo Powell stated that she believed that Appellant Powell was going to leave after initially clipping Mr. Sherwood, but she said that he put the vehicle in reverse after Mr. Sherwood got up and approached the vehicle and screamed at Appellant Powell.

13

Amy Jo Powell acknowledged that during the early morning hours of April 27, 2015, she may have called Appellant Powell and asked him to pick up their children from the hotel. Amy Jo Powell agreed that she "cannot say with any certainty" that Mr. Sherwood did not hit Appellant Powell when the two were tussling behind Appellant Powell's vehicle.

**Joshua Paetsch**. Mr. Paetsch, an officer with the Fernandina Beach Police Department, testified that he was dispatched to the Days Inn during the early morning hours of April 27, 2015. Officer Paetsch stated that when he arrived at the scene, he came into contact with Shawn Sherwood, and he said that Mr. Sherwood was covered in blood. Officer Paetsch testified that paramedics subsequently arrived at the scene and began attending to Mr. Sherwood. Officer Paetsch stated that he then searched the area for a knife, but he said that he did not find a knife at the scene.

**Kevin Strickland**. Mr. Strickland is a custodian of records for AT&T and during his testimony, the State introduced a copy of Appellant Powell's cell phone records. Mr. Strickland stated that from 4:40 "UTC time" on April 26, 2015, to 18:57 "UTC time" on April 27, 2015, there were no calls placed from Amy Jo Powell's number to Appellant Powell's number.

**William Haney**. Mr. Haney, a sergeant with the Fernandina Beach Police Department, testified that during the early morning hours of April 27, 2015, he observed Appellant Powell running towards the police station. Sergeant Haney stated that he proceeded to approach Appellant Powell and he said that Appellant Powell

> placed his arms up, his writes [sic] together and said, I ran over him. I stabbed – I stabbed him with a knife. I came to turn myself in.

Sergeant Haney testified that he proceeded to arrest Appellant Powell.

**William Evatt**. Mr. Evatt, an officer with the Fernandina Beach Police Department, testified that he "processed" the crime scene in this case (i.e., he took photographs and collected evidence), and several of the photographs were introduced by the State during Officer Evatt's testimony. Officer Evatt stated that he also searched a white SUV and he found a pocketknife in the vehicle.

On cross-examination, Officer Evatt testified that there was "[l]ow lighting" at the scene of the incident where Appellant Powell's vehicle hit Shawn Sherwood.

**Daniel Escalada**. Mr. Escalada, a crime laboratory analyst with the Florida Department of Law Enforcement, testified that he conducted DNA testing on various items of evidence from this case. Mr. Escalada stated that he tested a pocketknife and he found Shawn Sherwood's DNA/blood on the pocketknife. Mr. Escalada said that he also tested a swab that was obtained from the rear window of a vehicle and he found Mr. Sherwood's DNA on the swab that came from the window (but he clarified that the swab did not show the presence of any blood – only Mr. Sherwood's DNA).

Doc. 7-4 at 10-18 (internal record citations omitted).

After the state rested its case, Petitioner presented the following witnesses:

**Shawn Sherwood**. Mr. Sherwood stated that he has no memory of the incident that occurred on April 27, 2015.

**Allison Gossett (recalled)**. Ms. Gossett stated that on the evening of April 27, 2015, she heard Shawn Sherwood say – in reference to Appellant Powell – "here's my chance; finally I can kick his butt." Ms. Gossett testified that Mr. Sherwood made this statement when they were behind the Days Inn, and she said that upon making the statement, Mr. Sherwood started going towards Appellant Powell's vehicle (and before Appellant Powell put his car in gear and started

15

driving toward Mr. Sherwood). After being refreshed with prior deposition testimony, Ms. Gossett added that Mr. Sherwood also said that Mr. Sherwood had indicated on the evening of the incident that he disliked Appellant Powell and he wanted to "settle" their problems and put an end to it. Ms. Gossett testified that by making the comments set forth above, Mr. Sherwood was threatening Appellant Powell with bodily injury.

**Appellant Powell**. Appellant Powell stated that prior to trial, he worked at RockTenn – a company that makes linerboard paper – and he said that he always carries a pocketknife with him in case of emergency (i.e., in case he had to cut a rope while at work to prevent someone from being dismembered). Appellant Powell testified that on the evening of April 26, 2015, he came into contact with Shawn Sherwood at a bar, and he said that Mr. Sherwood told him the following:

> I'm going to pop a cap in your ass, you punk-ass faggot. Biggest cock sucker on the island.

Appellant Powell stated that he took a picture of Mr. Sherwood making a gun gesture, and the picture was introduced into evidence during Appellant Powell's testimony. Appellant Powell testified that he backed away from Mr. Sherwood and then left the bar, and Appellant Powell said that he was scared that Mr. Sherwood was going to shoot him. Appellant Powell stated that after he left the bar, Mr. Sherwood proceeded to call his cell phone and he said that Mr. Sherwood left him threatening voice messages. Appellant Powell testified that during the early morning hours of April 27, 2015, his ex-wife (Amy Jo Powell) called him and asked him to come and get their children from the hotel room where the children were, and Appellant Powell said that he proceeded to drive to the hotel. Appellant Powell stated that when he arrived at the hotel, Mr. Sherwood approached his truck and "beat[] on the hood" and said "[g]et the fuck out of the truck, you pussy." Appellant Powell testified that Mr. Sherwood then "swipe[d] at his

windshield," causing it and the side-view mirror on the driver's side of the truck to break. Appellant Powell stated that he backed-up his truck, but he said that he could not see because his side-view mirror was broken, and Appellant Powell admitted that when he backed up, he bumped Mr. Sherwood to the ground (but Appellant Powell explained that he did so inadvertently because he could not see). Appellant Powell testified that he then got out of his truck and he and Mr. Sherwood began to fight, and he said that Mr. Sherwood punched him in the face. Appellant Powell stated that Defendant's Exhibit 6 represented the way he looked after his fight with Mr. Sherwood. Appellant Powell testified that after he was hit by Mr. Sherwood, he stabbed Mr. Sherwood in self-defense: "I felt I had no alternative." Appellant Powell reiterated that at the time of the fight, he believed Mr. Sherwood was going to kill him.

On cross-examination, Appellant Powell was asked if he tried to murder Mr. Sherwood and he answered, "[y]es[, i]t wasn't my intention."

Id. at 18-21 (internal record citations omitted). The defense rested and the

state did not present any rebuttal witnesses. See id. at 21.

In the state's brief on direct appeal, the state generally agreed with

Petitioner's summary of the testimony as set forth above with the following

exceptions and additions:

During Allison Gossett's testimony in the State's case in chief, she stated that Appellant exited the vehicle and got on top of the victim prior to engaging in the altercation. Stephen Coleman then tried pulling Appellant off the victim. Appellant left and Ms. Gossett went over to the victim. The victim was "extremely distressed," was lying on the ground, and was choking and bleeding.

During cross-examination, Appellant made the following statements:

17

Appellant testified that he was able to pull forward, past the group in the parking lot, yet he stopped. He stated nothing was in his way and he could have kept going.

Appellant testified that he didn't originally leave and go to the police station because he wanted to get the victim. He stated he wanted "an end to the threats."

Appellant stated that he had said after he stopped he "popped [the vehicle] in reverse and . . . ran [the victim's] A-S-S over."

Appellant admitted he told the police he hopped out of the truck and stabbed the victim in the throat, like he had promised he would.

Appellant admitted he tried to murder the victim.

Appellant admitted it was his intention to stab the victim in the neck when he exited the vehicle.

Appellant admitted he wanted the victim "gone from this earth."

Appellant admitted he knew he was wrong as soon as he hit the victim with the car.

Appellant admitted he kept going because he wanted to kill the victim.

Doc. 7-5 at 8-9.

## IV.  <u>Analysis</u>

### A. Ground One

Petitioner argues that his trial counsel was ineffective by erroneously advising Petitioner that he should testify at trial. Doc. 1 at 14. According to

Petitioner, "[c]ounsel's advice was patently unreasonable (i.e., based on the facts of this case, no reasonable attorney would have encouraged Petitioner Powell to testify)." Id. He asserts that his self-defense theory "was sufficiently developed through other witnesses," but "[a]s a result of defense counsel's erroneous advice, the State was able to aggressively cross-examine Petitioner . . . ultimately destroying his theory of defense." Id. at 14-15. The crux of Petitioner's claim is that counsel's advice regarding whether Petitioner should testify was deficient; thus, even though Petitioner freely and voluntarily waived his right not to testify, he did so on deficient advice. See id. at 17; Doc. 12 at 3. Petitioner contends that he is entitled to an evidentiary hearing on this claim because the record "do[es] not conclusively refute whether, under the circumstances, a reasonable attorney would have encouraged or advised Petitioner Powell to testify." Doc. 1 at 18.

Petitioner, through the same counsel who represents him in the instant case, raised this claim in his postconviction motion filed pursuant to Florida Rule of Criminal Procedure 3.850. The postconviction court summarily denied the claim:

> In Ground Two, Defendant argues Defense Counsel erroneously advised him to testify at trial. Defendant emphasizes that, by testifying, the State was able to use damaging statements he made during a post-incident interrogation by law enforcement officers to impeach his trial testimony even though the trial judge had previously ruled these statements inadmissible because the officers

violated Defendant's Fifth Amendment Rights. Relevant to Ground Two, the trial court's colloquy with Defendant included the following discussion:

> THE COURT: As you know, you have a constitutional right to remain silent, that is, not to testify as a witness in this case. The jurors have been informed of that right by the Court at *voir dire* and also during preliminary instructions, and they would again be so instructed prior to deliberation, should you not testify. The jurors would also be reminded, your failure to testify should not be viewed as an admission of guilt and that they should not view that in any way and be influenced by that in their decision-making.

> I must also advise you that you have a constitutional right to testify. It is your right to testify or not testify. And no one can make that decision except you. I encourage you to consult with your attorneys, if you have not done so sufficiently already, to tell the Court after you have been fully advised whether you wish to testify.

> Have you consulted with your attorneys on this matter?

> THE DEFENDANT: Yes, Your Honor.

> THE COURT: Do you wish additional time to do so?

> THE DEFENDANT: One minute? 30 seconds?

> THE COURT: Yes, sir. Take all the time you need.

> (...)

20

THE DEFENDANT: (Conferring with defense counsel.)

I'm ready, Your Honor.

MR. DAVIS [For the Defense]: Your Honor, we've finished our consultation.

THE COURT: Mr. Powell, let me ask you again, do you need any further time to consult with your attorneys?

THE DEFENDANT: No, sir, Your Honor.

THE COURT: You believe you've been fully advised in this matter.

THE DEFENDANT: Yes, sir.

THE COURT: Do you wish to testify?

THE DEFENDANT: Yes, Your Honor.

(…)

THE COURT: Is there any additional evidence you would wish presented to the jury?

THE DEFENDANT: It will be brought in.

THE COURT: With those witnesses or through your testimony.

THE DEFENDANT: My testimony, Your Honor.

THE COURT: Yes, sir.

MR. HILL [For the State]: Judge, the one thing I wanted to address and make sure, the

colloquy with the defendant, because of the nature that it is, the Court will recall there was an interview in this case that the defense filed a motion to suppress for Miranda violations. Mr. Siegel, when he was handling the case, consented to that, and that interview has been suppressed and not used in the State's case in chief.

I provided the Court and defense, I guess, Hughey, H-U-G-H-E-Y, v. State, 411 So. 2d 1021. It's a 1982 case out of the Fifth District Court of Appeal. And it cites to Oregon v. Hass, which is -- to Hass, which is a United States Supreme Court case which stands for the proposition that when a statement is suppressed for a Miranda violation, such as we have here, that that statement can be used for impeachment purposes, essentially allowing me to cross examine this defendant regarding his interview if he chooses to take the stand.

Because of that, Judge, I do think it would be appropriate to address that with the defendant because in the State's mind, the interview, he makes very frank, incriminating statements. And so because of that, Judge, I think that should be something that's colloquied with him, that he understands that I will be able to use that to impeach him and he's been advised of that.

THE COURT: All right. I have read[] Hughey. Do you wish to address it?

MR. DAVIS: Your Honor, I believe the law in the State of Florida is that when Mr. Powell takes the stand, he becomes a witness like any other witness, and he's subject to cross examination and impeachment. The question for the Court, is there carte blanche to the State or

any party in the trial to simply cross examine beyond the scope of my direct examination? Just because I –

THE COURT: I don't think they're asking that. As I understand it, what Mr. Hill's representation was is that should your client's statements be impeachable by the suppressed statement, he would be allowed to impeach him from that statement. But he would not be allowed to offer that statement in or offer any other parts of that statement that you have not elicited on your direct examination. He would be limited to the use of that statement by your direct examination.

MR. DAVIS: Yes. I believe that to be the law in the State of Florida. I believe it's been the law.

THE COURT: And you agree, Mr. Hill?

MR. HILL: Judge, with the one caveat. I don't believe it's substantive evidence. I agree with the Court that it's impeachment. I don't think -- if Mr. Davis, I assume, puts his credibility at stake and asks any question regarding it, I don't think I'm only limited to the one subject matter. For instance, if he asked about what happened at the scene, I think I'm entitled to ask about what happened at the scene and his motivation for going there, those type of things.

But I'm with the Court. I just want to make sure that I'm not only allowed to impeach the one single question he asks him on because I don't think that that is where the scope is intended to be limited to. And if I misheard the Court, I apologize but I just wanted to clarify.

23

THE COURT: Well, let's just try to play it by ear, but I think there is some limitation –

MR. HILL: Yes, sir. I agree.

THE COURT: -- to your ability to use that statement. And part of that limitation would be constricted by Mr. Davis's examination.

MR. HILL: Yes, sir.

THE COURT: You certainly, I don't believe, can go beyond his direct examination.

MR. HILL: Yes, sir. Thank you.

THE COURT: And are we still going to have Mr. Powell testify?

MR. DAVIS: Yes, we are, Your Honor.

THE COURT: Well, let's try to do it. Let's bring the jury in.

Thus, during Defendant's sworn colloquy with the trial court, the court informed Defendant that he had an absolute right to testify in his own defense if he wanted to do so. Defendant acknowledged his understanding of this right. The court informed Defendant that while he should consult with his lawyers, the decision of whether to testify was ultimately Defendant's alone. See Jones v. Barnes, 463 U.S. 745, 751 (1983) ("[T]he accused has the ultimate authority to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal . . . ."). Defendant acknowledged his understanding of this fact. Moreover, the parties held a full on-the-record discussion about the possibility the State could use otherwise inadmissible statements to impeach Defendant's testimony. Equipped with this knowledge, Defendant still decided to testify in order to share his version of events with the jury. Defendant

24

may not now undo a decision he made voluntarily and with a full understanding of its consequences. To permit Defendant to do so would be to ignore his sworn assertions to the trial court. Defendant may not obtain postconviction relief in that manner. See Kelley, 109 So. 3d at 812-13; Henry, 920 So. 2d at 1246.

Additionally, as covered in the previous sections detailing the evidence, all eyewitnesses to the confrontation testified about Defendant being the clear aggressor in the Seabreeze parking lot. Defendant's postconviction argument ignores this fact and the practical reality that there was absolutely no other eyewitness who could have testified to Defendant's version of events. As a result, it would have been essentially impossible for Defendant to advance his self-defense theory without becoming a witness.

Finally, Defendant made many incriminating statements during cross-examination unrelated to anything he said or did during his interview with law enforcement officers.[FN] Counsel certainly could not have anticipated the extreme degree to which Defendant would incriminate himself while on the witness stand. The Constitution guarantees a criminal defendant a competent lawyer, not a clairvoyant one. See Harvard v. State, 486 So. 2d 537, 541 n.6 (Fla. 1986) (Booth, J., dissenting) (noting that the law does not expect lawyers and judges to be clairvoyant). For these reasons, the Court denies Ground Two of Defendant's motion.

[FN] To recap, Defendant's incriminating testimony included the following exchange:

Q: I'm sorry, sir. I don't understand your answer. Is it a "yes" or "no"? Did you try to murder Shawn Sherwood?

A: Yes.

> Q: That was your intention when you got outside the vehicle and stabbed him in the neck, isn't that true, sir?
>
> A: Yes.
>
> Q: You weren't satisfied with stopping after hitting him with the car. You wanted him gone from this earth, in your words, sir, or gone from this spot.
>
> A: Yes.
>
> Q: And you knew that you were in the wrong as soon as you hit him with your car, isn't that true, sir?
>
> A: Absolutely.
>
> Q: And yet you kept going because you wanted to kill him, isn't that true, Mr. Powell?
>
> A: Yes. I went beyond my breaking point.
>
> Q: I'm sorry, sir? I couldn't hear you.
>
> A: Yes.

Doc. 7-11 at 64-68 (internal record citations omitted). Petitioner appealed the postconviction court's denial of this claim, and the First District Court of Appeal per curiam affirmed the postconviction court's decision without issuing a written opinion. Doc. 7-15 at 3.

This Court addresses this claim in accordance with the deferential standard for federal court review of state court adjudications. "Defense counsel bears the primary responsibility for advising the defendant of his right to testify

26

or not to testify, the strategic implications of each choice, and that it is ultimately for the defendant himself to decide." <u>United States v. Teague</u>, 953 F.3d 1525, 1533 (11th Cir. 1992). "In other words, the right to counsel guarantees a defendant the right to receive advice concerning his decision to testify, while the right to testify guarantees a defendant the personal right to choose whether to testify." <u>United States v. Anderson</u>, 1 F.4th 1244, 1254 (11th Cir. 2021).

The eyewitness testimony at trial showed that Petitioner struck the victim with his car, then put the vehicle in reverse and hit the victim again; the victim did not get up off the ground after being hit the second time; and Petitioner exited his vehicle and stabbed the victim in the neck. <u>See</u> Doc. 7-2 at 40-46, 63-67, 105-10, 140-42, 165-70.[3] Sergeant Haney testified that on the night of the incident, he exited the police station to go to the crime scene, but as he was approaching his patrol vehicle, he saw Petitioner running toward the lobby of the station. <u>Id.</u> at 205-06. Sergeant Haney explained that when he encountered Petitioner, Petitioner "turned to me. He placed his arms up, his

---

[3] Defense counsel attempted to impeach Petitioner's ex-wife with her prior statement to police, but she repeatedly testified that the victim was on the ground when Petitioner stabbed him. Doc. 7-2 at 169-70; <u>id.</u> at 170 ("And there's no way that [the victim] could have been standing up at the high rate of speed that [Petitioner] had just hit him at, and he was on the curb, I remember, with his head on the concrete, with a busted head.").

writes [sic] together and said, I ran him over. I stabbed -- I stabbed him with a knife. I came to turn myself in." Id. at 206.

Given the testimony and evidence presented, the Court finds that counsel's advice was not deficient. There is a strong presumption in favor of competence when evaluating the performance prong of the Strickland ineffectiveness inquiry. See Anderson v. Sec'y, Fla. Dep't of Corr., 752 F.3d 881, 904 (11th Cir. 2014). The inquiry is "whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690. "[H]indsight is discounted by pegging adequacy to 'counsel's perspective at the time' . . . and by giving a 'heavy measure of deference to counsel's judgments.'" Rompilla v. Beard, 545 U.S. 374, 381 (2005). Thus, Petitioner must establish that no competent attorney would have taken the action that his counsel chose.

Notably, the test for ineffectiveness is neither whether counsel could have done more nor whether the best criminal defense attorneys might have done more; in retrospect, one may always identify shortcomings. Waters v. Thomas, 46 F.3d 1506, 1514 (11th Cir. 1995) ("[P]erfection is not the standard of effective assistance."). Instead, the test is whether what counsel did was within the wide range of reasonable professional assistance. Ward, 592 F.3d at 1164; Dingle v. Sec'y for Dep't of Corr., 480 F.3d 1092, 1099 (11th Cir. 2007) ("The question is whether some reasonable lawyer at the trial could have acted as defense counsel

acted in the trial at issue and not what most good lawyers would have done." (internal quotation marks and citation omitted)).

It cannot be said that no reasonable lawyer would have advised Petitioner to testify. And the trial court's colloquy with Petitioner reflects that Petitioner knew that the state could use the previously-suppressed statements to impeach him on cross-examination. Regardless, even assuming deficient performance, Petitioner has not shown prejudice. He has not shown a reasonable probability that the outcome of the proceeding would have been different had counsel advised him not to testify. Thus, upon thorough review of the record and the applicable law, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented. Petitioner is not entitled to federal habeas relief on Ground One.

**B. Ground Two**

Petitioner argues that his trial counsel was ineffective for failing to investigate and present defense witnesses at trial. Doc. 1 at 21. According to Petitioner, prior to trial, he advised his counsel of witnesses Tiffany Bragdon

and Anita Goulet, and he summarizes the testimony they would have provided. Id. at 22; see also Doc. 12-1 at 2-3 (declaration of Anita Goulet).[4]

Petitioner, through the same counsel who represents him in the instant case, raised this claim in his Rule 3.850 motion. The postconviction court summarily denied the claim:

> In Ground One, Defendant argues Defense Counsel should have called Tiffany Bragdon and Anita Goulet as defense witnesses at trial. Defendant alleges he told Defense Counsel about the need to present these witnesses, but that Defense Counsel nevertheless failed to do so.

> Defendant testified at trial. He was the final witness presented by the Defense. Prior to his testimony, the trial court conducted a sworn colloquy with Defendant. The portion of the colloquy relevant to Ground One reads:

> THE COURT: Mr. Powell, the Court has now received all the State's evidence in chief. And I assume by calling Mr. Powell, he would be your last witness?

> MR. DAVIS [For the Defense]: He will be the last witness for the day, I believe, Your Honor. We have one -- at least one witness for tomorrow.

> THE COURT: And who would that be?

> MR. STEGER [For the Defense]: That would be Mr. Yates. He's a professional engineer who would be called to testify as to the damage to the vehicle of the defendant.

---

[4] Ms. Goulet's declaration was completed on September 15, 2022. Doc. 12-1 at 3. Thus, it was not part of the state court record.

THE COURT: Thank you. Mr. Powell, other than Mr. Yates, who is yet to be called, the Court has received presumably all the evidence in this case.

(…)

THE COURT: Mr. Powell, let me ask you again, do you need any further time to consult with your attorneys?

THE DEFENDANT: No, sir, Your Honor.

THE COURT: You believe you've been fully advised in this matter.

THE DEFENDANT: Yes, sir.

THE COURT: Do you wish to testify?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Other than Mr. Yates, are there other witnesses that you wish to call to testify in this trial?

MR. DAVIS: Your Honor, there is one additional witness that we may wish to call. It is a Miss Goulet. She would be -- potentially be called and this is one of those where -- the limitation on Mr. Sherwood and his testimony means that my client and Mr. Steger and I need to discuss whether Miss Goulet would be called as a witness or not.

THE COURT: Mr. Powell, other than Mr. Yates and Miss Goulet, are there any other witnesses that you would anticipate calling?

THE DEFENDANT: No, Your Honor.

31

THE COURT: Other than the testimony and evidence that might come through your testimony and the testimony of Mr. Yates and Miss Goulet, should they be called, is there any additional evidence you wish presented to the jury?

THE DEFENDANT: May I have 30 seconds to confer?

THE COURT: Yes, sir.

THE DEFENDANT: (Conferring with defense counsel.) Thank you, Your Honor.

THE COURT: Is there any additional evidence you would wish presented to the jury?

THE DEFENDANT: It will be brought in.

THE COURT: With those witnesses or through your testimony?

THE DEFENDANT: My testimony, Your Honor.

THE COURT: Yes, sir.

This colloquy defeats Defendant's claim about Ms. Bragdon. The trial court asked Defendant under oath whether there were any additional witnesses he wished to call. Defendant did not mention Ms. Bragdon, even though he now claims he told Defense Counsel *before* trial that he wanted to call Ms. Bragdon as a witness. Thus, accepting Defendant's allegation about Ms. Bragdon would require discounting his sworn representation to the trial court. Defendant may not obtain postconviction relief in that manner. See Kelley v. State, 109 So. 3d 811, 812-13 (Fla. 1st DCA 2013) ("A rule 3.850 motion cannot be used to go behind representations the defendant made to the trial court, and the court may summarily deny post-conviction claims that

are refuted by such representations."); <u>Henry v. State</u>, 920 So. 2d 1245, 1246 (Fla. 5th DCA 2006) ("Defendants are bound by the statements made by them under oath . . . .").

The record likewise defeats Defendant's claim about Ms. Goulet. In his motion, Defendant argues Ms. Goulet would have testified about Mr. William Shawn Sherwood's (i.e., the victim's) reputation for violence. The State did not call Mr. Sherwood as a witness at trial because in his deposition, Mr. Sherwood testified that he had no memory of the events at issue. Instead, Defense Counsel called Mr. Sherwood as a witness at trial. Mr. Sherwood again testified that he had no memory of the events at issue.

Evidence of a person's character or a trait of character is generally inadmissible to prove action in conformity with the trait on a particular occasion. <u>See</u> § 90.404, Fla. Stat. (2016). Certain exceptions exist for the character of the accused, the character of the victim, and the character of a witness. <u>See</u> <u>id.</u> Here, Mr. Sherwood was both the victim and a witness. A party may use reputation evidence to impeach the character of a witness only when the evidence is relevant to character for truthfulness. <u>See</u> § 90.404(1)(c) and 90.609, Fla. Stat. (2016). Thus, Ms. Goulet's hypothetical testimony about Mr. Sherwood's reputation for violence would have been inadmissible to impeach Mr. Sherwood's credibility as a witness.

On the other hand, because of Mr. Sherwood's role as the victim in this case, Ms. Goulet's hypothetical testimony could have been admissible to show Mr. Sherwood's alleged reputation for violence. <u>See</u> § 90.404(1)(b)1., Fla. Stat. (2016); <u>Antoine v. State</u>, 138 So. 3d 1064, 1075-76 (Fla. 4th DCA 2014). However, Defendant's IAC claim still fails because he cannot demonstrate the prejudice necessary to prevail under <u>Strickland</u>.

The body of record evidence shows there is no reasonable probability the outcome of Defendant's trial would have changed if only Ms. Goulet had testified in the manner Defendant now describes. The State presented

overwhelming evidence of Defendant's guilt. This evidence included the testimony of four eyewitnesses, each of whom testified that Defendant struck the victim with his vehicle, threw his vehicle into reverse to strike the victim a second time, and exited the vehicle to stab the victim in the neck while the victim was already on the ground. Defendant drove to Fernandina Beach Police Department headquarters to surrender to police custody. While there, he told Sergeant Haney, "I ran him over. I stabbed -- I stabbed him with a knife. I came to turn myself in." Defendant also said he knew that he had just ruined his life. Finally, while on the witness stand at trial, Defendant made a series of highly incriminating statements. Defendant admitted that he tried to murder the victim, that it was his intention to do so when he exited his vehicle, that he wanted the victim gone from the earth, and that he knew he was in the wrong as soon as he hit the victim with his car. On these facts, there is no reasonable probability the outcome of Defendant's case would have changed if only Ms. Goulet had testified about the victim's reputation for violence. It is clear that Defendant was the aggressor at the Seabreeze bar during the early morning hours of April 27, 2015. The evidence adduced at trial conclusively shows the victim's reputation for violence was immaterial to Defendant's actions on the night in question. Because Defendant cannot show that he was prejudiced by Ms. Goulet not testifying, his IAC claim fails on the merits.

In sum, the record and the law conclusively refute the claims contained in Ground One of Defendant's motion. Accordingly, the Court denies Ground One.

Doc. 7-11 at 60-64 (internal record citations omitted). Petitioner appealed the

postconviction court's denial of this claim, and the First DCA per curiam

affirmed the postconviction court's decision without issuing a written opinion.

Doc. 7-15 at 3.

This Court addresses this claim in accordance with the deferential standard for federal court review of state court adjudications. The record supports the state court's conclusion. The jury was presented with evidence regarding the victim's aggressive or violent behavior on the date in question. Indeed, Petitioner's daughter testified that the victim smelled of alcohol and he was angry that evening because he believed his girlfriend (Petitioner's ex-wife) was cheating on him. Doc. 7-2 at 48-49. The girlfriend (Petitioner's ex-wife) testified that the victim called her repeatedly that evening, he was calling her names, and that when he saw Petitioner's vehicle in the parking lot, he was cussing and angry. See id. at 149-53, 162-63. She further testified that prior to this incident, the victim had gotten angry because his cell phone would not work properly, so he threw it in a pond. Id. at 151-52. Mr. Coleman testified that the victim initially came "towards [him] aggressively," such that Mr. Coleman perceived the victim wanted to fight when the victim mistook Mr. Coleman for Petitioner. Id. at 76-77. Ms. Gossett testified that when they were behind the Days Inn and before Petitioner hit the victim with his vehicle, she heard the victim say in reference to Petitioner, "[H]ere's my chance; finally, I can kick his butt." Id. at 275. She further testified that the victim "ran to the front of [Petitioner's] vehicle and slammed his hands down on the hood of the car." Id. at 105. Finally, Petitioner testified that earlier that evening, the victim had threatened "to pop a cap in [his] ass," while making a gun gesture, and the

victim repeatedly threatened him that evening through voice mails and text messages. Id. at 295, 300-01. Additionally, Petitioner testified that the victim beat on the hood of his vehicle, told him to "[g]et the fuck out of the truck, you pussy," and smashed his windshield and broke off the driver's side mirror. Id. at 304-05. Petitioner took a picture of the victim making the gun gesture toward him, which was also introduced at trial. Id. at 296.

Thus, the jury was presented with evidence suggesting that the victim was aggressive and threatening toward Petitioner on the night in question. This evidence would more strongly support Petitioner's self-defense theory than Ms. Bradgon testifying that the victim was aggressive toward other patrons in the bar earlier that evening or Ms. Goulet testifying that the victim had a reputation for being aggressive or violent. Upon review, the Court finds that Petitioner fails to show a reasonable probability exists that but for his counsel's alleged ineffectiveness, the outcome of the trial would have been different. Therefore, upon thorough review of the record and the applicable law, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented. Petitioner is not entitled to federal habeas relief on Ground Two.

## C. Ground Three

Petitioner claims that his trial counsel was ineffective by failing to present evidence during the trial. Doc. 1 at 28. Specifically, Petitioner contends counsel should have presented evidence that earlier in the night, the victim was aggressive toward other patrons at the Seabreeze Lounge, such that the police were called. Id. Petitioner asserts that such evidence would have supported his theory of defense. Id.

Petitioner, through the same counsel who represents him in the instant case, raised this claim in his Rule 3.850 motion. The postconviction court summarily denied the claim:

> In Ground Three, Defendant argues Defense Counsel should have presented additional evidence about Mr. Sherwood's alleged actions at the Seabreeze bar on the night in question. Specifically, Defendant believes his lawyer should have presented evidence that the police received a phone call from the bar complaining that Mr. Sherwood was behaving aggressively toward *"other patrons in the bar/lounge,* including Amy Jo Powell."
>
> During his colloquy with the trial court, Defendant swore there was no additional evidence he wished to present to the jury other than what he was about to bring in through his own testimony. Ground Three of Defendant's motion fundamentally contradicts his sworn assertions to the trial court. Defendant may not obtain postconviction relief in that manner. See Kelley, 109 So 3d at 812-13; Henry, 920 So. 2d at 1246. Moreover, the overwhelming record evidence of Defendant's guilt shows that he was not prejudiced by Defense Counsel not presenting the evidence Defendant discusses in Ground Three. Finally, even accepting *arguendo* the initial version of events Defendant gave during his direct

examination, Defendant never claimed that he acted in the
defense of "other patrons" at the Seabreeze bar. He also does
not claim that he was aware of the alleged phone call from
the bar to the police at the time of his confrontation with the
victim in the bar's parking lot. <u>See</u> <u>Antoine</u>, 138 So. 3d at
1075-76 ("Specific acts of aggression and violence by the
victim are inadmissible to prove that the victim was the
aggressor and that the defendant acted in self-defense. For
this category of evidence, a defendant's knowledge of a
victim's specific acts of violence is a precondition to
admissibility.") (internal quotation omitted). Accordingly,
Defendant cannot demonstrate how this additional evidence,
even if presented at trial, would have materially helped his
case.

For the reasons set forth above, the Court denies
Ground Three of Defendant's motion.

Doc. 7-11 at 69-70 (internal record citations omitted). Petitioner appealed the

postconviction court's denial of this claim, and the First DCA per curiam

affirmed the postconviction court's decision without issuing a written opinion.

Doc. 7-15 at 3.

This Court addresses this claim in accordance with the deferential

standard for federal court review of state court adjudications. Upon thorough

review of the record and the applicable law, the Court concludes that the state

court's adjudication of this claim was not contrary to clearly established federal

law, did not involve an unreasonable application of clearly established federal

law, and was not based on an unreasonable determination of the facts in light

of the evidence presented. Thus, Petitioner is not entitled to federal habeas

relief on Ground Three.

### D. Ground Four

Petitioner claims that his trial counsel was ineffective by failing to obtain a use of force expert and failing to present the expert's testimony at trial. Doc. 1 at 30. Petitioner asserts that the issue at trial was whether the alleged victim "was in the process of attacking [Petitioner] at the time of the incident – and therefore whether Petitioner . . . was justified in his actions." Id. But trial counsel "failed to present a use of force expert who could have opined that Petitioner . . . had an objective fear for his safety in light of [the victim's] imminent attack." Id. In support, Petitioner filed a supplement that includes a report by Roy Bedard, Ph.D. Doc. 13.[5]

Petitioner, through the same counsel who represents him in the instant case, raised this claim in his Rule 3.850 motion. The postconviction court summarily denied the claim:

> In Ground Four, Defendant argues his lawyer should have presented a "use of force" expert witness at trial. Defendant's motion reads:
>
>> An issue at trial was whether the alleged victim (Shawn Sherwood) was in the process of attacking the Defendant at the time of the incident - and therefore whether the Defendant was justified in his actions. However, defense

---

[5] Petitioner advises that he "is hopeful that the Court will grant an evidentiary hearing on Ground 4 in order to allow Dr. Bedard to testify—and this report represents a proffer of Dr. Bedard's testimony." Doc. 13 at 1-2. Dr. Bedard's report is dated December 2, 2022. Doc. 13-1 at 25. This report was completed after Respondents filed the Response in this case. The report was not part of the state court record.

counsel failed to present a use of force expert who could have opined that the Defendant had an objective fear for his safety in light of Mr. Sherwood's imminent attack and therefore the Defendant's actions were justifiable. Had a use of force expert been presented at trial, the expert would have refuted the State's argument that the Defendant was not justified in his actions (and had the jury heard this testimony, there is a reasonable probability that the jury would not have returned a guilty verdict).

Even accepting Defendant's allegations *arguendo,* his claim fails as a matter of law. The function of an expert witness is to illuminate matters that are both within the witness's realm of expertise and are beyond the ken of the jury. See § 90.702, Fla, Stat, (2016); see also Johnson v. State, 314 So. 2d 248, 252 (Fla. 1st DCA 1975) ("The subject matter of an opinion by an expert witness must be so related to some science, profession, business or occupation as to be beyond the understanding of the average layman."). An expert witness may not make legal conclusions. See Lee Cty. v. Barnett Banks, Inc., 711 So. 2d 34, 34 (Fla. 2d DCA 1997) ("Expert testimony is not admissible concerning a question of law."); Crown Custom Homes, Inc. v. Sabatino, 18 So. 3d 738, 741 (Fla. 2d DCA 2009) ("Regardless of the expertise of the witness generally, and his familiarity with legal concepts relating to his specific field of expertise, it is not the function of the expert witness to draw legal conclusions.") (internal quotation omitted); Cty. of Volusia v. Kemp, 764 So. 2d 770 773 (Fla. 5th DCA 2000) ("Furthermore, an expert should not be allowed to render an opinion which applies a legal standard to a set of facts.").

Opining that Defendant "had an objective fear for his safety," that he was in danger of an "imminent attack," and that his "actions were justifiable" are legal conclusions that Defendant acted in self-defense. See § 776.012, Fla. Stat. (2016) (providing that a person may use deadly force against another if he or she "reasonably believes that [using or threatening to use] such force is necessary to prevent

40

imminent death or great bodily harm to himself or herself or another or to prevent the imminent commission of a forcible felony."); <u>Mederos v. State</u>, 102 So. 3d 7, 10 (Fla. 1st DCA 2012) ("The Stand Your Ground Law abrogates the common law duty to retreat and generally authorizes the use of force in self-defense or in the defense of others ... [T]he act authorizes the use of deadly force when such force is reasonably believed necessary to prevent imminent death, great bodily harm, or the commission of a forcible felony, and the person using such force is presumed to have held a reasonable fear of imminent peril of death or great bodily harm to himself or herself or another.") (internal quotations omitted). As such, the hypothetical expert testimony Defendant describes in his motion would have been inadmissible and Defense Counsel was not ineffective for failing to attempt to present such inadmissible testimony.

Possibly in recognition of this shortcoming, Defendant added the following argument in a footnote to his Amended Motion:

> Most jurors do *not* have an understanding regarding the applicable factors involved in a case involving the use of deadly force. The question of how people react when under the stress of a violent attack is a subject which is beyond the common understanding of the average person (and a subject for which a "use of force" expert would assist the trier of fact in understanding the evidence or in determining a fact in issue) [sic].

Defendant's supplemental argument fails for two reasons. First, many jurors probably do not have an understanding of the factors involved in a claim of justifiable use of deadly force, but it is the presiding judge's job using jury instructions, not a hired expert's, to explain the legal requirements of the "applicable factors" involved in such a case. Second, the question of how people psychologically react under the stress of a violent attack (e.g., fight or flight, impulsivity) may very well be beyond the common

understanding of a lay person, but there was little credible evidence presented at trial that Defendant was actually the subject of a "violent attack" by the victim when Defendant hit him with his vehicle, put the vehicle in reverse and hit him again, and stabbed him. Every independent witness identified Defendant as the aggressor and Defendant contradicted his own direct testimony during his cross-examination when he admitted it was his intention to "murder" the victim, that he wanted the victim "gone from this earth," and he "knew he was in the wrong" immediately after he attacked the victim. Regardless of whether it was or was not below what would reasonably be expected of a lawyer defending such a case, the record conclusively and clearly shows Defendant was not prejudiced by his trial counsel's failure to call a "use of force" expert and any testimony from this type of expert would not have been able to overcome the overwhelming evidence of Defendant's guilt.[]

Furthermore, as set forth in the Court's discussion of Grounds One and Three, Defendant's sworn colloquy with the trial court undermines claims that his lawyer was ineffective for failing to call additional Defense witnesses (including the hypothetical use of force expert Defendant describes in Ground Four). See Kelley, 109 So. 3d at 812-13; Henry, 920 So. 2d at 1246. Because both the record and law conclusively refute the claim raised therein, the Court denies Ground Four of Defendant's motion.

Doc. 7-11 at 69-70 (internal record citations omitted). Petitioner appealed the postconviction court's denial of this claim, and the First DCA per curiam affirmed the postconviction court's decision without issuing a written opinion. Doc. 7-15 at 3.

This Court addresses this claim in accordance with the deferential standard for federal court review of state court adjudications. Even assuming

42

the proposed expert testimony would have been admissible, Petitioner fails to show prejudice. Petitioner presented evidence, through his testimony and the testimony of others, to support his theory of self-defense. But given the overwhelming evidence of Petitioner's guilt, he fails to show a reasonable probability exists that had the jury heard from an excessive force expert, the outcome of the trial would have been different. Thus, upon thorough review of the record and the applicable law, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented. Thus, Petitioner is not entitled to federal habeas relief on Ground Four.

**E. Ground Five**

According to Petitioner, his trial counsel was ineffective for failing to investigate an involuntary intoxication defense. Doc. 1 at 36. He argues that at the time of the incident, he had taken his prescribed Adderall which "clouded [his] thought process and ultimately caused him to act in a more reactive manner." Id.

Petitioner, through the same counsel who represents him in the instant case, raised this claim in his Rule 3.850 motion. The postconviction court summarily denied the claim:

In Ground Five, Defendant argues Defense Counsel should have raised an involuntary intoxication defense. Defendant's Motion reads:

> At the time of the incident, the Defendant had been prescribed the medication Adderall, and he had taken the medication prior to his altercation with the alleged victim. The medication clouded the Defendant's though [sic] process and ultimately caused the Defendant to act in a more reactive manner (i.e., when faced with a fight or flight scenario, the medication caused him to fight). Prior to trial, the Defendant informed defense counsel about this medication, but defense counsel failed to investigate the matter.

Florida does not recognize a voluntary intoxication defense. See § 775.051, Fla. Stat. (2015). However, a defendant may use a defense of involuntary intoxication to negate the intent element of a specific intent crime. Miller v. State, 805 So. 2d 885, 887 (Fla. 2d DCA 2001). To establish an involuntary intoxication defense, the defendant has the burden of showing that (1) a medical practitioner lawfully prescribed him the substance at issue, (2) he used the prescription in the manner directed by the medical practitioner, and (3) that as a result of taking the prescription in a lawful manner, the defendant became so intoxicated that he could not form the requisite specific intent at the time of his offense. Fla. Std. Jury Instr. (Crim.) 3.6(e)(1).

Here, even accepting Defendant's allegations about elements (1) and (2) *arguendo,* he cannot show he became so intoxicated from his Adderall prescription that he was unable to form specific criminal intent. As quoted above, Defendant speculates that the medication "clouded his thought process" and ultimately caused him to "act in a more reactive manner." However, Defendant does not contend that he was so impaired as to not know what he was doing or to be incapable of forming criminal intent. Indeed,

Defendant's trial testimony belies any *ex post facto* contention that Adderall was to blame for his criminal acts:

> [Mr. Hill, for the State]: Mr. Powell , isn't it true that you tried to murder Shawn Sherwood?
>
> A [Defendant]: (No response.)
>
> Q: Mr. Powell, "yes" or "no" answer.
>
> A: Yes. It wasn't my intention.
>
> Q: It was your intention to murder him.
>
> A: It wasn't but –
>
> Q: It was not.
>
> A: But yes, to answer your question.
>
> Q: I'm sorry, sir. I don't understand your answer. Is it a "yes" or "no"? *Did you try to murder Shawn Sherwood?*
>
> A: *Yes.*
>
> Q: *That was your intention when you got outside the vehicle and stabbed him in the neck, isn't that true, sir?*
>
> A: *Yes.*
>
> Q: *You weren't satisfied with stopping after hitting him with the car. You wanted him gone from this earth, in your words, sir, or gone from this spot.*
>
> A: *Yes.*

Q: *And you knew that you were in the wrong as soon as you hit him with your car, isn't that true, sir?*

A: *Absolutely.*

Q: *And yet you kept going because you wanted to kill him, isn't that true, Mr. Powell?*

A: *Yes. I went beyond my breaking point.*
Q: *I'm sorry, sir? I couldn't hear you.*

A: *Yes.*

This exchange shows that Defendant considered his options before taking action and that he acted with premeditation. It also shows that Defendant immediately knew his actions were wrong. This sworn testimony fatally undermines any contention that Defendant's use of Adderall prevented him from forming specific criminal intent.

Additionally, the Defense's version of events at trial was that Defendant acted in self-defense. Defendant does not contend that Defense Counsel should have abandoned this self-defense theory. Instead, Defendant implicitly avers that Defense Counsel should have developed an involuntary intoxication defense *in addition to* the self-defense theory. However, self-defense necessarily contemplates rational thought on the part of the actor to recognize and proportionately respond to an imminent threat of death or great bodily harm. See § 776.012, Fla. Stat, (2015); Mederos, 102 So. 3d at 10. Failing to develop an involuntary intoxication defense did not render Defense Counsel ineffective when such a defense would have been fundamentally incompatible with Defendant's version of events. See Rigternick v. State, 193 So. 3d 846, 868 (Fla. 2016) (holding that defense counsel was not ineffective for failing to present evidence which contradicted the defendant's trial testimony).

> Both the record and the law show that Defendant cannot establish the elements <u>Strickland</u> requires. Accordingly, the Court denies Ground Five of Defendant's motion.

Doc. 7-11 at 73-75 (internal record citations omitted). Petitioner appealed, and the First DCA per curiam affirmed the postconviction court's denial of this claim without issuing a written opinion. Doc. 7-15 at 3.

This Court addresses this claim in accordance with the deferential standard for federal court review of state court adjudications. The evidence presented, including Petitioner's own testimony, fails to suggest that Petitioner may have been so intoxicated from his Adderall that he was incapable of forming the requisite criminal intent. Instead, even though the jury rejected it, Petitioner's strongest defense was self-defense. And counsel was not deficient in failing to investigate Petitioner's use of Adderall. Nor has Petitioner shown prejudice. Upon thorough review of the record and the applicable law, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented. Thus, Petitioner is not entitled to federal habeas relief on Ground Five.

### F. Ground Six

Petitioner contends the trial court erred by denying his motion to allow the jury to conduct a "view" of his vehicle used in the incident. Doc. 1 at 39.

Prior to trial, defense counsel filed a motion seeking an order allowing the jury to view Petitioner's vehicle in the courthouse garage. Doc. 7-1 at 53-54. Defense counsel argued that "[t]he physical condition of the vehicle, combined with the vantage point the driver of the vehicle would have at the time of the subject incident, are critical issues," and Petitioner "has the Constitutional right to present a full and complete defense, including showing the jury the vehicle in question." Id. The trial court held a hearing on the motion. See id. at 309-16. Defense counsel argued the probative value of allowing the jury to view the vehicle was to show the damage to the vehicle caused by the victim when the victim was being the "initial aggressor," which would support Petitioner's self-defense theory. Id. at 313. The state objected, arguing that the "photographs can serve the purpose for which the defense . . . would like to put in any of that evidence." Id. The state also addressed concerns of confusing the jury, because allowing each juror to sit in the driver's seat would not replicate what Petitioner saw that night nor would they be able to recreate where all the witnesses were in relation to the vehicle. Id. at 313-15. At the conclusion of the hearing, the trial court denied the request. See id. at 309-16.

On direct appeal, Petitioner, through the same counsel who represents him in the instant case, argued that the trial court erred by denying his motion to allow the jury to conduct a "view" of the vehicle. Doc. 7-4 at 23-25. In doing so, Petitioner discussed state court cases, and he concluded that he "was denied his constitutional right to a fair trial," while citing the Fifth and Fourteenth Amendments, along with the corresponding portion of the Florida Constitution. Id. at 25. The state filed an answer brief, Doc. 7-5 at 12-14 (relying on state court case law), and Petitioner replied, Doc. 7-6 at 5 (citing only state law). The First DCA per curiam affirmed Petitioner's conviction and sentence on this issue. See Doc. 7-7 at 3 ("Because we find that the trial court did not abuse its discretion in denying Appellant's request for a jury view, . . . we affirm the judgment.").

Here, Respondents argue this claim is unexhausted because Petitioner did not present the federal nature of this claim to the state court. See Doc. 7 at 40-42. The Court agrees. As noted, Petitioner's argument on direct appeal focused entirely on state law principles. The only reference to federal law is in his conclusory paragraph where he stated that he was denied the constitutional right to a fair trial while citing to the Fifth and Fourteenth Amendments and the corresponding section of the Florida Constitution. This brief citation, without any further discussion of federal law or principles, was insufficient to alert the state court that he was raising a federal claim. See McNair v.

49

<u>Campbell</u>, 416 F.3d 1291, 1303 (11th Cir. 2005) (holding "that [t]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record" (internal quotation marks and citations omitted)); <u>see also</u> <u>Ditullio v. Sec'y, Dep't of Corr.</u>, No. 22-13609, 2025 WL 784713, at *3 (11th Cir. Mar. 12, 2025) (finding claims unexhausted when the petitioner "argued his claims under state law, with only a vague and passing reference to the federal constitution"); <u>Snyder v. Fla. Dep't of Corr.</u>, No. 23-12972, 2024 WL 4867047, at *1 (11th Cir. Nov. 22, 2024) (finding the petitioner's "single reference to the due process clauses of the state and federal constitutions in the closing paragraph of his argument failed to put the state court on notice of the federal issue"); <u>Ramos v. Sec'y, Fla. Dep't of Corr.</u>, 441 F. App'x 689, 696 (11th Cir. 2011) (finding that "one passing reference to federal law in an appellate brief "did not fairly present the [federal nature of the] issue to the state court").[6] Thus, this claim is unexhausted and procedurally barred. Petitioner has not shown cause or prejudice to excuse his procedural bar, nor has he shown a fundamental miscarriage of justice would result if the Court

---

[6] The Court does not rely on unpublished opinions as binding precedent; however, when cited in this Order it is because the Court finds them persuasive on a particular point. <u>See</u> <u>McNamara v. GEICO</u>, 30 F.4th 1055, 1060-61 (11th Cir. 2022); <u>see generally</u> Fed. R. App. P. 32.1; 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

does not address this claim on the merits. As such, Petitioner's claim that the trial could erred by denying his motion for a jury view is denied.

Alternatively, assuming the federal nature of this claim is exhausted, the Court finds the claim has no merit. Insofar as Petitioner argues that the trial court erred in its evidentiary rulings, "federal courts will not generally review state trial courts' evidentiary determinations." Taylor v. Sec'y, Fla. Dep't of Corr., 760 F.3d 1284, 1295 (11th Cir. 2014); see Alderman v. Zant, 22 F.3d 1541, 1555 (11th Cir. 1994) ("As a general rule, a federal court in a habeas corpus case will not review the trial court's actions concerning the admissibility of evidence," because the state court "has wide discretion in determining whether to admit evidence at trial[.]"). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). "Habeas relief is warranted only when the error 'so infused the trial with unfairness as to deny due process of law.'" Taylor, 760 F.3d at 1295 (quoting Lisenba v. People of State of California, 314 U.S. 219, 228 (1941)); see Boykins v. Wainwright, 737 F.2d 1539, 1543 (11th Cir. 1984) (federal courts are not empowered to correct erroneous evidentiary rulings in state court except where rulings deny petitioner fundamental constitutional protections).

Here, the trial court's decision to deny Petitioner's request for the jury to view his vehicle did not affect the fundamental fairness of Petitioner's trial. Allowing the jury to view the vehicle in the courthouse garage would not have replicated the crime scene and each juror, if allowed to sit in the vehicle,[7] would have had a different vantage point than Petitioner did. The vehicle also had not been kept in police custody, so whether the vehicle was in the same condition as when Petitioner last drove it on the subject evening was questionable. Additionally, photographs of the scene and the vehicle were introduced, and Petitioner testified as to his perceptions and "line of sight" from the vehicle on the night he hit the victim. Considering the record, the Court finds that the trial court's denial of Petitioner's request for a jury view did not render his trial fundamentally unfair. Thus, the Court denies Ground Six.

## G. Ground Seven

Petitioner contends that the trial court erred by admitting prejudicial photographs of the victim in the hospital. Doc. 1 at 41-44.

At trial, the state sought to introduce photographs of the victim while he was in the hospital following the incident to show the injuries he suffered. See Doc. 70-2 at 91. Defense counsel argued that the probative value of the

---

[7] At the hearing, the trial judge asked defense counsel whether he requested that each juror have the opportunity to sit in the vehicle. Doc. 7-1 at 315. Defense counsel responded, "Depending on the testimony that's adduced at trial, potentially, Judge. . . . One of the issues is what can be observed within that vehicle." Id.

photographs was substantially outweighed by the danger of unfair prejudice given the gruesomeness of the photographs. See id. at 93-94. The trial court found some of the photographs to be cumulative, but overruled defense counsel's objection to other photographs and admitted them into evidence. See id. at 97-98.

Petitioner, through the same counsel who represents him in the instant case, raised this claim on direct appeal. Doc. 7-4 at 26-31. But he argued the claim in terms of state law only, with the exception that in his conclusion, he stated that Petitioner "was denied his constitutional right to a fair trial," citing the Fifth and Fourteenth Amendments, along with the corresponding section of the Florida Constitution. Id. at 31. The state filed an answer brief, Doc. 7-5 at 15-22 (citing only state law), and Petitioner replied, Doc. 7-6 at 6-7 (citing only state law). The First DCA per curiam affirmed Petitioner's conviction and sentence on this issue. See Doc. 7-7 at 3 ("Because we find that the trial court did not abuse its discretion . . . in admitting photographs of the victim, . . . we affirm the judgment.").

Respondents contend that this claim is unexhausted because Petitioner failed to present the federal nature of the claim to the state court. See Doc. 7 at 46. For the same reasons as stated in Ground Six, the Court agrees. Indeed, Petitioner's sole citation to the Fifth and Fourteenth Amendments in the conclusory paragraph of his initial brief failed to put the state court on notice

that he was raising a federal claim. See McNair, 416 F.3d at 1303 (holding "that [t]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record" (internal quotation marks and citations omitted)). Thus, this claim is unexhausted and procedurally barred. Petitioner has not shown cause or prejudice to excuse his procedural bar, nor has he shown a fundamental miscarriage of justice would result if the Court does not address this claim on the merits. As such, Petitioner's claim that the trial could erred by admitting certain photographs of the victim is denied.

Nevertheless, assuming the federal nature of this claim is exhausted, the Court finds it has no merit. Again, insofar as Petitioner argues that the trial court erred in its evidentiary rulings, "federal courts will not generally review state trial courts' evidentiary determinations." Taylor, 760 F.3d at 1295; see Alderman, 22 F.3d at 1555 ("As a general rule, a federal court in a habeas corpus case will not review the trial court's actions concerning the admissibility of evidence," because the state court "has wide discretion in determining whether to admit evidence at trial[.]"). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle, 502 U.S. at 67-68. "Habeas relief is warranted only when the error 'so infused the

trial with unfairness as to deny due process of law.'" Taylor, 760 F.3d at 1295 (quoting Lisenba, 314 U.S. at 228); see Boykins, 737 F.2d at 1543 (federal courts are not empowered to correct erroneous evidentiary rulings in state court except where rulings deny petitioner fundamental constitutional protections). Thus, to the extent Petitioner argues that the state court violated state law, such claim is not cognizable on federal habeas review. And upon consideration of the record, the Court finds that the admission of the photographs at issue did not render Petitioner's trial fundamentally unfair. See Snowden v. Singletary, 135 F.3d 732, 737 (11th Cir. 1998) ("A denial of fundamental fairness occurs whenever the improper evidence is material in the sense of a crucial, critical, highly significant factor." (internal quotation marks and citation omitted)). Thus, Ground Seven is denied.

### H. Ground Eight

Petitioner contends that the trial court erred by failing to give the necessity/duress jury instruction as requested by the defense. Doc. 1 at 44.

During the charge conference at trial, the defense requested the trial court instruct the jury on "common law necessity," because when Petitioner testified at trial, he stated, in effect, that "he did what he did because he - - it was necessary." Doc. 7-3 at 30-31. Defense counsel explained, "We do not request a Florida standard jury instruction. We simply ask for the instruction on common law defense of necessity, and we cite those cases that would be

supportive of it." <u>Id.</u> at 31. The state objected, arguing that the standard instruction contained six elements, while the one provided by the defense only contained two, and the defense also requested a self-defense instruction which "could potentially be confusing and duplicative." <u>Id.</u> at 30-31. The trial court denied the defense's request, stating that "if the defendant wishes to assert the self-defense of necessity, I believe that the standard instruction is the most appropriate." <u>Id.</u> at 31. Defense counsel then requested the standard instruction and the trial court agreed to give it, <u>id.</u>, but the defense subsequently withdrew the request after conferring with Petitioner, <u>id.</u> at 45.

On direct appeal, Petitioner, through the same counsel who represents him in the instant case, raised this claim. Doc. 7-4 at 32-38. He argued the claim in terms of state law only. <u>See id.</u> He did cite to one United States Supreme Court case, but only to explain the "modern understanding of the [necessity/duress] defense." <u>Id.</u> at 34. Additionally, in his conclusion, he stated that Petitioner "was denied his constitutional right to a fair trial," while citing to the Fifth and Fourteenth Amendments, along with the corresponding section of the Florida Constitution. <u>Id.</u> at 38. The state filed an answer brief addressing this claim, Doc. 7-5 at 22-29 (citing only state law and the same United States Supreme Court case as Petitioner), and Petitioner replied, Doc. 7-6 at 8 (citing only state law). The First DCA per curiam affirmed Petitioner's conviction and sentence on this issue. <u>See</u> Doc. 7-7 at 3 ("Because we find that the trial court

did not abuse its discretion . . . in denying [Petitioner's] request for a special jury instruction, we affirm the judgment.").

Respondents assert that this claim is unexhausted because Petitioner failed to present the federal nature of the claim to the state court. Doc. 7 at 50. For the same reasons as stated above in Grounds Six and Seven, the Court agrees. Petitioner's argument on direct appeal focused on state law—his scattered citations to one United States Supreme Court case and two federal constitutional amendments did not put the state court on notice that Petitioner was raising a federal claim. See McNair, 416 F.3d at 1303 (holding "that [t]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record" (internal quotation marks and citations omitted)). Thus, this claim is unexhausted and procedurally barred. Petitioner has not shown cause or prejudice to excuse his procedural bar, nor has he shown a fundamental miscarriage of justice would result if the Court does not address this claim on the merits. As such, Petitioner's claim that the trial could erred by refusing to give his requested instruction is denied.

Alternatively, assuming Petitioner properly exhausted the federal nature of this claim, the Court finds it is without merit. "State court jury instructions ordinarily comprise issues of state law and are not subject to federal habeas corpus review absent fundamental unfairness." Jones v. Kemp, 794 F.2d 1536,

1540 (11th Cir. 1986). To establish fundamental unfairness, the petitioner must demonstrate "the error 'so infected the entire trial that the resulting conviction violates due process.'" Jacobs v. Singletary, 952 F.2d 1282, 1290 (11th Cir. 1992) (quoting Henderson v. Kibbe, 431 U.S. 145, 154 (1977)). "An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." Henderson, 431 U.S. at 155. In such cases, the burden on the petitioner is "especially heavy." Id.

Here, considering the instructions given and the trial record as a whole, the Court finds that the trial court's decision to reject the defense's requested instruction did not render Petitioner's trial fundamentally unfair. Thus, Ground Eight is denied.

## I. Ground Nine

According to Petitioner, "[a]ll of the errors committed" in Petitioner's case, "considered either individually or together, resulted in Petitioner . . . being denied a fair proceeding." Doc. 1 at 49.

Assuming this claim is cognizable on federal habeas review and sufficiently exhausted, the Court finds it is without merit. None of Petitioner's individual claims warrant relief; thus, there is nothing to accumulate. See Morris v. Sec'y, Dep't of Corr., 677 F.3d 1117, 1132 (11th Cir. 2012). The alleged errors, neither individually nor cumulatively, deprived Petitioner of a fair trial or due process. Thus, Ground Nine is denied.

Accordingly, it is

**ORDERED**:

1.     The Petition (Doc. 1) is **DENIED**, and this case is **DISMISSED WITH PREJUDICE**.

2.     The **Clerk of Court** shall enter judgment dismissing this case with prejudice, terminate any pending motions, and close the file.

3.     If Petitioner appeals, the Court denies a certificate of appealability. Because the Court has determined that a certificate of appealability is not warranted, the **Clerk** shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.[8]

**DONE AND ORDERED** at Jacksonville, Florida, this 19th day of March, 2025.



TIMOTHY J. CORRIGAN
Senior United States District Judge

---

[8] The Court should issue a certificate of appealability only if the Petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)). Here, after consideration of the record as a whole, the Court will deny a certificate of appealability.

JAX-3 3/18
c:
Counsel of Record
Jason Robert Powell, #J58345